# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JEFFREY L. POMBERT,

Plaintiff,

v.

GLOCK, INC.,
CONSULTINVEST, INC.,
ROBERT T. CORE,
JAMES M. DEICHERT, and
JOHN F. RENZULLI,

Defendants.

NO. _____

---

**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Phone (770) 419-8505
Fax (770) 590-8958

**JOHN F. SALTER**
Georgia Bar No. 623325
john@barneslawgroup.com

**ROY E. BARNES**
Georgia Bar No.030040
roy@barneslawgroup.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION............................................................1

II.   PARTIES AND NON-PARTY STATE ACTORS............................3

      A.   Parties...................................................................................3
      B.   Glock Sr.'s Controlling Influence..........................................5
      C.   The Enterprise.......................................................................6

III.  JURISDICTION AND VENUE....................................................10

IV.   BACKGROUND INFORMATION................................................12

      A.   The "Glock Structure"..........................................................12
      B.   The Falling Out Between Glock Sr. and Ewert.......................18

V.    THE INVESTIGATION BY HARPER.........................................20

      A.   Scope of the Harper Team's Engagement...............................20
      B.   Billing Rates and Terms........................................................22
      C.   Harper's Investigation Succeeds Regarding Ewert But Also Uncovers
           Evidence Pointing to Complicity of Glock Sr..........................24
      D.   Harper's Team Facilitates Investigation of Competing Claims to
           Ownership over Unipatent......................................................27
      E.   Harper Discovers the Adaptation of Ewert's Glock Structure Schemes
           by Glock Sr............................................................................29
      F.   Plaintiff Finds the Missing Link To Defeat Ewert's Embezzlement
           Scheme..................................................................................32
      G.   Panama Operation..................................................................34

VI.   GLOCK SR.'S REVERSAL OF POSITION................................38

      A.   Harper's Unpaid Bills.............................................................40
      B.   Criminal Complaint Made Against Harper...............................40
      C.   Glock Sr., Glock Inc., Renzulli, Deichert, and Core Fabricate a
           Malicious Prosecution of Both Harper and Plaintiff...................43
      D.   Harper's Investigative Files....................................................45

**VII.   THE ENTERPRISE CONSPIRES WITH, DIRECTS, AND CONTROLS STATE ACTORS**………………………………………45

**VIII.  INDICTMENT, FALSE ARREST AND RESOLUTION IN FAVOR OF PLAINTIFF**………………………………………………49

**IX.    PLAINTIFF'S EVIDENCE OF ENTERPRISE CONSPIRACY WITH STATE ACTORS BUTTERS AND OFFICER HARRISON FOR PURPOSES OF EVIDENCE- AND WITNESS-TAMPERING**………51

**X.     RESPONDEAT SUPERIOR**……………………………………57

COUNT ONE:  Conspiracy for Violation of Civil Rights, 42 U.S.C. § 1983…….57

COUNT TWO:  State Law Claim For Malicious Arrest And Prosecution………….60

COUNT THREE:  O.C.G.A. § 16-14-4(A)………………………………….60

COUNT FOUR:   O.C.G.A. § 16-14-4(B)………………………………….67

COUNT FIVE:   O.C.G.A. § 16-14-4(C)………………………………….68

COUNT SIX:  Punitive Damages……………………………………….69

**PRAYER FOR RELIEF**…………………………………………...69

# COMPLAINT

**COMES NOW** Plaintiff Jeffrey L. Pombert, by and through undersigned counsel, and alleges the following complaint against the above-named defendants.

## I.    NATURE OF THE ACTION

1.      This is an action by Jeffrey L. Pombert for damages arising from a malicious prosecution instigated and orchestrated by Defendants and their agents or associates in furtherance of a criminal enterprise and pattern of racketeering activity. The purpose of the malicious prosecution of Plaintiff was to silence, punish, and discredit him in order to conceal an ongoing racketeering scheme spanning decades and, literally, the globe. To that end, Defendants engaged in a wide-ranging campaign of evidence tampering, falsification of evidence, and improper influencing of witnesses. As a direct result, Plaintiff suffered great injury.

2.      Defendants, led by Gaston Glock Sr. ("Glock Sr."), designed their scheme for the purpose of punishing, discrediting, and retaliating against Plaintiff who, as part of a team of investigators led by James R. Harper, III ("Harper"), uncovered knowledge and evidence implicating Glock Inc., Consultinvest, and Glock Sr. in various unlawful schemes.

3.      Defendants, Glock Sr., and a host of Glock-related entities were involved in certain racketeering activities that employed a tangled web of fictive

legal relationships, offshore business entities, and international financial transactions ("the Glock Structure") . Upon information and belief, the object of the primary racketeering scheme was for purposes of tax evasion and/or to steal, siphon, divert, and hide monies and assets away from Glock Sr.'s familial relatives.

4.      The Glock Structure, as a matter of practice and *modus operandi*, disrespected and misused virtually all of the characteristic instruments of lawful commerce by documenting pretextual corporate acts, titles, contracts, and legal relationships, by issuing and paying sham invoices for transactions without economic substance, and by creating "dummy" corporate entities and structures that lacked any valid business purpose. These machinations were designed to provide Defendants, Glock Sr., and his associates with plausible deniability and the false appearance of arm's-length dealings.

5.      In his professional capacity as an attorney, between approximately March 2001 and March 2003, Plaintiff assisted Harper with a sensitive, complicated, and multi-faceted mission involving an internal corporate investigation, tax- and legal-compliance work, and a globe-trotting legal campaign to preserve Glock Sr.'s control over Glock Inc.'s cash-flows and its related corporate entities. In the course of the investigation, Harper uncovered evidence

consistent with a pervasive racketeering scheme that had the potential to implicate Glock Sr., himself.

6.      Subsequently, the Glock Structure combined in a conspiracy to target, falsely arrest, and maliciously prosecute Plaintiff for purposes of smearing, discrediting, punishing, and falsely imprisoning him.   In aid of this conspiracy, an Enterprise was formed that, over a period of years, tampered with evidence, illegally influenced witnesses, withheld material and exculpatory evidence, and fabricated false evidence for the purpose of causing injury to Plaintiff.  The Defendants secured the cooperation of State Actors, who abdicated their solemn role of screening criminal complaints to shield citizens against vindictive prosecutions.  What followed was a privately-financed, privately-led criminal "investigation" in which the State Actors were mere bystanders. Armed with the power of an "out-sourced" public prosecution, the Defendants used it for private vengeance.

## II.   PARTIES AND NON-PARTY STATE ACTORS

### A.   Parties

7.      Plaintiff  is an attorney in good standing, licensed to practice law in the State of Georgia.

8.      Prior to his retention as part of Harper's investigative team, Plaintiff was a lawyer with a successful civil practice in complex commercial litigation. Following this engagement, Plaintiff's reputation and livelihood were smeared by an arrest and indictment based on charges that were trumped up by Glock Sr.'s proxies using phony evidence and tampered witnesses as part of a conspiracy that included state actors acting under color of state law.

9.      Plaintiff has standing to bring these claims because, as described more fully herein, he is a person who sustained injury in the form of unjust arrest, malicious prosecution, as well as damage to his professional livelihood, reputation, and property by reason of Defendants' conduct. Defendants' acts of racketeering have been directed at Plaintiff and he was an intended victim of Defendants' actions.

10.      Defendant Glock, Inc. ("Glock Inc.") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

11.      Defendant Consultinvest, Inc. ("Consultinvest") is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

- 4 -

12.     Defendant John Renzulli ("Renzulli") is a citizen of New York and a New York lawyer and a participant in the Enterprise, defined *infra*.

13.     Defendant James Deichert ("Deichert") is a citizen of Georgia, a lawyer for Glock Sr., Glock Inc., and Consultinvest, and a participant in the Enterprise, defined *infra*.

14.     Defendant Robert Core ("Core") is a citizen of Virginia, a lawyer, and a participant in the Enterprise, defined *infra*.

**B.     Glock Sr.'s Controlling Influence**

15.     Glock Sr. is a citizen of the Republic of Austria.

16.     At all times material hereto, Glock Sr. exercised ultimate control and authority over Glock Inc. and  Consultinvest, such that those entities no longer had a separate mind, will, or corporate existence of their own. The corporate entities within the Glock Structure, including Glock Inc. and Consultinvest, were mere instrumentalities used by Glock Sr. to further his own interests. In substance, Defendants were mere alter egos of Glock Sr., such that it is fair to impute the actions of Glock Sr. to Glock Inc. and Consultinvest and vice versa.

17.     Each of the above corporate entities and others controlled by Glock Sr. comprise the Glock Structure.

- 5 -

C.     **The Enterprise**

18.     Cumulatively, the Enterprise, as it is used in this Complaint, consists of Glock Inc., Consultinvest, Glock Sr., Deichert, Renzulli, and Core, all of whom were agents of Defendants Glock Inc. and Consultinvest and combined their efforts with State Actors acting under color of state law in a related and common undertaking.

19.     The common undertaking of the Enterprise persisted over an extended period of years and employed the same or similar methods of commission of criminal acts (tampering with evidence, illegally influencing witnesses, planting false evidence, making false statements, and other unlawful acts), in connection with falsely arresting and maliciously prosecuting Plaintiff.

20.     The false arrest and prosecution of Plaintiff served a larger purpose of discrediting, punishing, and ruining Plaintiff in the hopes of shielding and secreting Defendants' and Glock Sr.'s participation in certain unlawful schemes in which the Glock Structure had been involved for many years and, upon information and belief, may continue to this day.

21.     Renzulli is a citizen of New York and a New York lawyer and a member of the Enterprise. Renzulli was employed by Glock Sr., Glock Inc., Consultinvest and/or other Glock Structure entities for the purposes of controlling

and furthering the malicious prosecution of Plaintiff. Renzulli committed acts in furtherance of the goals of the racketeering Enterprise, which included, among others, to discredit and punish Plaintiff and to engineer a false arrest and indictment to aid in the concealment of Glock Sr.'s complicity in the unlawful racketeering schemes and other illegal activities that pervaded Glock Inc., Consultinvest, and other Glock entities under the control of Glock Sr.

22.     Deichert is a citizen of Georgia, a lawyer for Glock Sr., Glock Inc. and Consultinvest, and a member of the Enterprise.  Deichert was employed by Glock Sr., Glock Inc., and / or other Glock Structure entities for the purposes of controlling and furthering the malicious prosecution of Plaintiff. As part of the Enterprise, Deichert falsified records, made false statements directed to law enforcement, and committed other acts in furtherance of the goals of the Enterprise.

23.     Core is a citizen of Virginia, a lawyer, and a member of the Enterprise. Core was employed by Glock Sr., Glock Inc., Consultinvest, and / or other Glock Structure entities for the purposes of controlling and furthering the malicious prosecution of Plaintiff. As part of the Enterprise, Core falsified records, created false "evidence," withheld exculpatory documents, illegally tampered with witnesses, and committed other acts in furtherance of the goals of the Enterprise.

- 7 -

24.     State Actor Ramon Keith Harrison ("Officer Harrison") is a former police officer for the City of Smyrna, located in Cobb County, Georgia. Under color of state law, Officer Harrison conspired and had a common understanding with the Enterprise to facilitate tampering with evidence, illegally influencing witnesses, and committing other acts in furtherance of the goals of the Enterprise. But for the protection of the legal doctrine of qualified immunity, Officer Harrison would have been named as a defendant in this action.

25.     State Actor John Butters ("Butters") is a former Cobb County assistant district attorney. Under color of state law, Butters conspired and had a common understanding with the Enterprise in order to facilitate tampering with evidence, illegally influencing witnesses, and committing other acts in furtherance of the goals of the Enterprise. But for the protection of qualified immunity and/or prosecutorial immunity, Butters would have been named as a defendant in this action.

26.     Each of those identified as members of the Enterprise and the State Actors intentionally played some material role in the conspiracy targeting Plaintiff regardless of whether each was aware of the roles and means employed by others.

27.     The Enterprise furnished a vehicle for the commission of a pattern of racketeering activity that, as an extension of the primary racketeering activity

involving the Glock Structure, had a secondary objective: targeting Plaintiff and others who had knowledge of Glock Sr. and his unlawful dealings in order to silence, punish, discredit, ruin, falsely arrest, and even falsely convict them.

28.     The Enterprise had a common purpose. Moreover, it had an ongoing structure or organization supported by personnel or associates with continuing functions or duties: lawyers operating under the pretended cloak of "attorney-client privilege"; a common source(s) of financing their efforts; relationships among those associated with the Enterprise; and longevity sufficient to sustain the Enterprise's purpose.

29.     A hierarchy existed in which Glock Sr. was the leader, while Defendants and members of the Enterprise (many of them attorneys answering to Glock Sr.) controlled and combined with the State Actors named herein to operate and manage the Enterprise's affairs and achieve its ends.

30.     The Enterprise is distinct from the pattern of the primary racketeering activity in which Glock Sr. and his trustee, Charles Ewert, presumably engaged in their joint establishment of the Glock Structure for unlawful purposes and the Enterprise is distinct from any one Defendant.

### III.   JURISDICTION AND VENUE

31.      This Court has subject matter jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1331 (federal question) because Plaintiff's claims arise pursuant to 42 U.S.C. § 1983, *et seq.* (conspiracy in deprivation of constitutional civil rights).

32.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under state law because the claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

33.      Defendants Glock Inc. and Consultinvest are subject to the personal jurisdiction of this Court because they are organized under the laws of the State of Georgia, maintain their principal places of business in the State of Georgia and Cobb County located in the Northern District of Georgia, and committed a substantial amount of the wrongs described herein in Cobb County and the State of Georgia.

34.      Defendant Deichert is subject to the personal jurisdiction of this Court as a resident of the State of Georgia living within this federal district.

35.      Defendants Renzulli and Core are subject to the personal jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91(1) and (3) because they:

(a)      have regularly transacted business within the State of Georgia;

(b)      committed tortious acts and omissions within the State of Georgia; and

(c)      committed tortious injuries within the State of Georgia by acts and omissions outside the State of Georgia.

36.      Defendants may be served pursuant to Rule 4 of the Federal Rules of Civil Procedure and/or 18 U.S.C. § 1965(d).

37.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Glock Inc. and Consultinvest reside and maintain their principal places of business within the Northern District of Georgia. Further, venue is proper in this district pursuant to § 1391(b)(2) because:

(a)      a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district;

(b)      Defendants pursued the malicious prosecution of Plaintiff under color of state law in conspiracy with State Actors located in this judicial district and using the courts of Cobb County, also located within this judicial district; and

(c)      a substantial part of the property that is the subject of the action is situated in this judicial district.

- 11 -

## IV. BACKGROUND INFORMATION

### A.   The "Glock Structure"

38.      Glock Inc. is one of the world's best known and most profitable firearms companies.

39.      Based in Smyrna, Georgia (and within this federal judicial district), Glock Inc. sells pistols manufactured by Glock Ges.m.b.H. in Austria.

40.      Glock Inc. sells weaponry to military and law enforcement agencies in at least forty eight countries, and to civilians in more than 100 countries.

41.      With an approximate sixty five percent market share, Glock Inc. dominates the United States gun market, the most lucrative market for handguns in the world. Throughout its history and today, the overwhelming bulk of Glock Inc.'s revenues have come from the United States.

42.      Glock's annual revenues have been estimated at $400 million, with more than a million of its guns sold in the United States in a single year.

43.      Glock Inc.'s success in penetrating the world's largest gun market, combined with an estimated profit margin per pistol of sixty eight percent made Glock Inc. a cash cow and extraordinary wealth-generating machine.

44.     Behind the scenes of Glock, Inc.'s astonishing success in conquering the American gun market, however, all was not well. Glock Sr. employed shadowy figures adept at creating a corporate structure, the Glock Structure, that, through a sequence of sham corporate acts, would repeatedly and falsely manipulate the stated ownership of Glock Inc. and the Glock Structure.

45.     These corporate machinations, which began almost as soon as Glock Inc. was formed, were just the beginning stages of what would eventually become a much broader racketeering scheme to siphon, divert, and hide monies and assets.

46.     The history of corporate acts reflecting the purported ownership of the Glock Structure over time is a study in disrespect for corporate formalities and the corporate form. It includes backdated documents, bearer agreements, abuse of powers of attorney, bogus agreements, phantom capital increases, and gratuitous share transfers masquerading as if they had a *bona fide* economic purpose.

47.     This was consistent with Glock Sr.'s habitual disregard of corporate formalities and purposeful misuse of legal documents that failed to correspond with reality.

48.     Upon information and belief, Glock Sr. and Charles Ewert ("Ewert") designed and operated the Glock Structure from its inception in the 1980s until July 27, 2009.

49.     Glock Sr. relied upon Ewert to develop a comprehensive plan for structuring and operating Glock Structure in such a way that Glock Sr. and his associates would be able to systematically and secretly divert income and assets from Glock Inc. for themselves.

50.     The Glock Structure was created to, and upon information and belief continues to, operate as Glock Sr.'s alter ego.

51.     Ewert served as a trustee of Glock Sr. and together, they improperly and unlawfully diverted over $100 million of revenues. Also, Ewert embezzled millions of dollars for himself.

52.     The structure devised by Glock Sr. and Ewert was complex and had several salient features intended to facilitate their scheme.

53.     Defendants carried out a methodical and deliberate pattern and practice of conducting sham transactions over a period of decades.

54.     One significant feature of the Glock Structure's corporate organization installed Ewert as the ostensible face of a Luxembourgish entity named Unipatent Holding S.A. ("Unipatent").  Unipatent was portrayed falsely by

- 14 -

Glock Sr. as an arm's-length partner of Glock Ges.m.b.H that had supposedly helped the company distribute its products internationally.

55.     Organizational charts illustrating the structure are attached hereto as Exhibit A and B. They do not include every member of the so-called Glock Structure or depict it as it may exist in the present day. The depicted entities included not only Glock Inc. (distribution for North America), but also Glock Hong Kong, and Glock America (distribution for Asia and South America, respectively).

56.     A second feature was a system of "royalty" payments to be made by Glock Inc. for use of the "Glock" name and logo. Although any legitimate payments should have been made to Glock Ges.m.b.H. (which held, at a minimum, a trademark for the logo), they were actually used as a means to funnel money to Glock Sr.

57.     By way of illustration, the initial agreement concerning royalty payments was dated as of December 1985 and signed by Glock Sr. (on behalf of Glock Ges.m.b.H.) and his associate Walter (on behalf of Glock Inc.). On information and belief, Glock Sr. has directly received improper royalty payments, despite the fact that he has never owned a trademark for either the Glock name or logo.

58.     The third feature of the scheme was that Ewert would form and operate three offshore "billing companies," whose sole purpose was to issue fake invoices to the operating entities of the Glock Structure. At one time, these billing companies included:

(a)     Base Technical Engineers Limited ("BTE"), incorporated in Ireland,  that issued fake invoices to Glock Ges.m.b.H.;

(b)     Minami Enterprises Limited ("Minami"), incorporated in Liberia, that    issued fake invoices to Glock Hong Kong; and

(c)     Taziria A.V.V. ("Taziria"), incorporated in Aruba, which issued fake invoices to Glock America.

59.     The fourth feature was that Ewert would act as the face of real estate holding companies also owned by Unipatent, whose purpose was to "own" the real property and equipment of the Glock Structure and to collect fraudulent "rents" from operating Glock Structure companies. These real estate holding companies included Consultinvest, Inc., incorporated in the State of Georgia with its registered agent in Cobb County.

60.     Glock Sr. and his associates incorporated Consultinvest solely for the purpose of collecting rents from Glock Inc.

61.     The fifth feature was that Ewert would form and operate sham finance companies, whose purpose was to document phony loans to the real estate holding companies — such as Consultinvest — and to issue fake invoices to them for purported interest on those loans.

62.     Glock Sr. stood behind the activities of each of the foregoing entities. Contrary to sworn deposition testimony in various lawsuits involving Glock guns, Glock Sr. owned 100 percent of Unipatent through a Panamanian entity, Reofin International S.A. ("Reofin").

63.     Glock Sr. gave perjured testimony in a case against Glock Inc. and Glock Ges.m.b.H. in a South Carolina state court when he falsely denied any personal knowledge of Unipatent's ownership. *Kimbrell v. Glock, Inc.,* Case No. 96-C-42-1946, Mar. 2, 1998 Glock Sr. dep. at 69, 71. (Ct. Com. Pl. Spartanburg Cnty., S.C.).[1]

64.     The truth was materially different. Glock Sr. did know who owned Unipatent. He owned it through Reofin.

65.     Through a series of foreign entities, including Reofin and Unipatent, Glock Sr. owned 100 percent of the real estate holding company

---

[1] Upon information and belief, Renzulli, in his capacity as corporate counsel for the Glock Structure corporate entities involved in the lawsuits would have witnessed Glock Sr.'s perjury.

Consultinvest and all of the "other half" of the Glock operating subsidiaries Glock Inc., Glock Hong Kong, and Glock America. Either through Reofin, or directly, Glock Sr. also owned 100 percent of the three offshore "billing companies" — BTE, Minami, and Taziria.

66.     Reofin served as a collection point for Glock Sr., whereby income and assets that were siphoned or diverted away from other corporate entities would eventually funnel into an entity, or entities, under Glock Sr.'s control. Upon information and belief, Ewert did not receive formal compensation for his role in the scheme, but was instead expected to take his cut directly from the entities and bank accounts that he administered.

67.     The complex features and unlawful purpose(s) of the Glock Structure were uncovered by Harper because of his engagement to pursue a lengthy and challenging internal investigation triggered by a bizarre falling out between Glock Sr. and Ewert, described in more detail infra.

**B. The Falling Out Between Glock Sr. and Ewert**

68.     Glock Sr.'s use of the Glock Structure to siphon, divert, and hide monies and corporate assets proceeded without any significant disruption until the summer of 1999 when Glock Sr. was attacked by an assailant in a parking garage

in Luxembourg.  Subsequently, Ewert was implicated in the bungled assassination-for-hire scheme.

69.     What followed next was a legal battle for corporate control over the components and pieces of the Glock Structure, even as the criminal investigation of Ewert proceeded simultaneously.

70.     Especially from 2000 to 2003, Glock Sr. and Ewert (and their lawyers and proxies) jousted in a series of legal skirmishes for control of the Glock Structure, including Unipatent, Consultinvest, and their respective bank accounts.

71.     Because many of these companies had been incorporated or based in far-flung jurisdictions—many of them notorious for having loose legal restrictions and /or as havens for money laundering and organized crime—Glock Sr. and Ewert's legal battles spanned the world globe.

72.     To aid him in this struggle, in 2000 Glock Sr. retained Harper, who would ultimately lead a team of lawyers and investigators under his supervision. Among other things, Harper was tasked with winning the contest with Ewert and cementing Glock Sr.'s control over the lucrative Glock Structure.

## V.    THE INVESTIGATION BY HARPER

73.    In pursuing Ewert through courts across the world, however, Glock Sr. had to disavow the fictive legal relationships Glock Sr. and Ewert had previously put in place together for the purpose of creating a patina of legitimacy for their unlawful transactions.

74.    Upon engaging Harper, Glock Sr. denied any knowledge or participation in the Glock Structure's schemes and blamed Ewert. At that time, and given Ewert's public implication in an assassination attempt upon Glock Sr., Harper had no cause to doubt Glock Sr.'s explanation.

75.    Harper accepted Glock Sr.'s assignment to defeat "Ewert's embezzlement scheme" and, secondarily, to guide the Glock Structure through the plethora of then-pending and anticipated investigations regarding legal and tax compliance.

### A.    Scope of the Harper Team's Engagement

76.    In or about August 2000, Glock Sr. and Glock Inc. retained Harper to defeat Ewert's embezzlement scheme and to bring the Glock Structure into legal and tax compliance.

77.     The scope of Harper's engagement for Glock Sr. developed into an investigation involving activities in Luxembourg, Ireland, Panama, Curacao, the United States, Hong Kong, Turkey, and other jurisdictions across the world.

78.     Harper was given "carte blanche" authority by Glock Sr. to accomplish the goals of the investigation.  Harper retained the services of over a dozen lawyers, accountants, security personnel, and other professionals in the United States and internationally to accomplish this assignment.

79.     Glock Sr. told Harper he had not known about the embezzlement / tax fraud schemes; Glock Sr. blamed Ewert.

80.     Part of Harper's responsibility was to liaise with law enforcement for purposes of disclosing information on Ewert and the Glock Structure for purposes of prosecuting Ewert.

81.     Consequently, the strategy for combating Ewert's designs partially depended upon Harper's credibility with law enforcement in the United States who Harper, on Glock Sr.'s behalf, would supply with evidence of Ewert's culpability.

82.     Harper accepted the Glock engagement upon the express condition that Glock Sr. authorize Harper to fully cooperate with the federal law enforcement authorities.

83.     Harper took the case on the conditions that Glock Sr., Glock Inc., and the Glock Structure fully cooperate with his investigation and that they give him authority to share openly, candidly, and completely what he learned with the FBI, IRS, and other government and court-appointed authorities who were or would be conducting investigations of Ewert's embezzlement and the face value tax fraud and money laundering schemes. Glock Sr., as well as agents of Glock Inc., Consultinvest, and other Glock Structure agents agreed to these conditions.

84.     With Glock Sr.'s knowledge and approval Harper hired a team of professionals – lawyers, CPAs, security personnel, experts in funds tracing, and support staff – to meet the needs of his ever-expanding investigation involving operations in Luxembourg, Ireland, Panama, Curaçao, the United States, Hong Kong, Turkey, and other places.

85.     Glock Sr. strictly limited the persons within the Glock Structure who had knowledge of the activities of Harper's investigation. He instructed Harper to limit his communications within the Glock Structure to Glock Sr. and certain of his most trusted advisors. Harper complied with this request.

**B.    Billing Rates and Terms**

86.     Glock Sr. instructed Harper to negotiate his billing rates, expenses, and other billing terms with Paul Jannuzzo ("Jannuzzo").

87.     Jannuzzo was a long-time Glock Inc. lawyer and trusted personal confidante of Glock Sr.  Jannuzzo reported directly to Glock Sr., himself.

88.     Harper was instructed by Glock Sr. to submit all bills for the investigation to Jannuzzo for approval and payment.

89.     Upon information and belief, Harper complied with this instruction.

90.     Likewise, Harper's bills were handled with minimal disclosure to regular Glock Inc. staff.

91.     Regarding Harper's investigation, Jannuzzo was directed by Glock Sr. that cost was "no object" and that Jannuzzo should not do anything to impede the progress of Harper's investigation.

92.     Glock Sr. had access to Harper's bills, either by direct request to Harper or through Jannuzzo.

93.     From late 2000 to March of 2003, Harper submitted bills to Jannuzzo for review and payment and in accordance with Glock Sr.'s instructions.

94.     Jannuzzo reviewed, approved, directed payment on, and kept confidential Harper's bills, all in accordance with Glock Sr.'s instructions.

95.     In early 2003, Jannuzzo and Glock Sr. had a personal disagreement and falling out. Jannuzzo resigned his employment from Glock Inc. and, later,

from Consultinvest. Upon information and belief, Jannuzzo left Harper's bills at Glock Inc.'s offices.

**C.    Harper's Investigation Succeeds Regarding Ewert But Also Uncovers Evidence Pointing to Complicity of Glock Sr.**

96.    From 2000 until March of 2003, Harper's investigation was intensive.

97.    Harper and his team uncovered that, until July 27, 1999, Glock Sr. and Ewert used the Glock Structure to launder a portion of Glock Inc. revenues through "face value" schemes that were unlawful. These schemes involved transfers of approximately $103,260,000 through phony marketing and "support" companies, and transfers of additional millions through Consultinvest in that:

(a)    Glock Ges.m.b.H., an Austrian company owned directly or indirectly by Glock Sr., would artificially mis-allocate distribution of its guns among three companies within the Glock Structure: Glock Inc., Glock America, N.V. (South America) ("Glock America"), and Glock (H.K.) Limited (Hong Kong) ("Glock HK").

(b)    For no legitimate reason, Glock Ges.m.b.H. would charge Glock Inc. higher prices than it charged Glock America and Glock HK.

- 24 -

(c)     Glock America and Glock HK would "sell" most of their allocations, which they had no reasonable expectation of selling in their territories, to Glock Inc. at artificially inflated prices.

(d)     Glock America and Glock HK would "pay" the difference, or some portion of the difference, in the prices to phony marketing companies.       Glock America "paid" Taziria Holding, A.V.V. ("Taziria") and  Glock HK"paid" Minami Enterprises Limited ("Minami") for non-existent marketing services. In this fashion, through July 1999, Minami skimmed in excess of $19.75 million and Taziria skimmed in excess of $20.5 million.

(e)     From Taziria and Minami, the funds would be funneled into other contrived shell companies having no real or legitimate business purpose. Taziria and Minami would transfer the proceeds to other bank accounts including the accounts of Reofin International, S.A. ("Reofin"), a Panamanian company.

(f)     Reofin would use the proceeds for various purposes such as to effect additional tax fraud schemes including, without limitation, funding loans to Consultinvest for the purchase of the land and buildings comprising the  Glock Structure's North America

- 25 -

headquarters in Smyrna, Georgia. Consultinvest would collect rents from Glock Inc. pursuant to leases and thereafter claim fictitious "interest" deductions in tax filings.

(g)     The schemes also involved "paying" a company, BTE, for non-existent "technical support" with funds received from the distribution companies.

98.     Harper's investigation implicated Ewert in these schemes, which appeared to violate various laws against tax evasion, money laundering, etc., but also raised questions regarding the participation of Glock Sr.

99.     Early on, Harper learned Glock Structure monies were involved in the ownership of a Turkish bank with money-laundering and terrorist connections. This development strengthened Harper's belief that his work would require open, candid, and complete transparency with the FBI, the IRS, and other law enforcement agencies.

100.    Initially, Glock Sr. and the Glock Structure agreed to and ratified Harper's strategy of cooperating with federal law enforcement and tax authorities.

101.    In early winter of 2001, Glock Sr. personally attended a meeting with Harper and a special agent of the IRS as well as an assistant U.S. attorney in the office of the Northern District of Georgia.

- 26 -

102.     During that meeting, the federal agents were emphatic that Glock Sr.'s full cooperation was required and that they were to follow the evidence "wherever it led."

103.     Glock Sr. agreed and, following the meeting, confirmed with Harper his instructions to proceed in full cooperation with the federal authorities, including the U.S. Attorney's Office, FBI, and IRS.

104.     Harper's investigation yielded outstanding results in line with Glock Sr.'s instructions to, in essence, "get Ewert."

105.     In 2001, Harper retained Plaintiff, a lawyer with experience in complex commercial litigation, for purposes of assisting with special projects and litigation strategy. At first, Harper asked Plaintiff to assist him with projects associated with Ewert's embezzlement scheme. In 2002, Harper tasked Plaintiff with developing a legal strategy to defeat Ewert's claim to Taziria, a company within the Glock Structure that was then under the control of Ewert.

**D.   Harper's Team Facilitates Investigation of Competing Claims to Ownership over Unipatent**

106.     After the failed assassination attempt, Ewert claimed ownership of Unipatent, a Luxembourg company within the Glock Structure.

107.     According to Ewert, Unipatent owned two (phony) marketing companies (Taziria and Minami), a "support" company (BTE), Consultinvest, a

- 27 -

half interest in Glock Inc, and interests in Glock America, Glock HK, and other companies.

108.     Glock Sr. denied that Unipatent owned the phony marketing and "support" companies but he acknowledged that Unipatent owned Consultinvest, a half interest in Glock Inc., and interests in other entities in the Glock Structure, too.

109.     To decide the competing claims between Ewert and Glock Sr. over Unipatent's ownership, a Luxembourg court appointed Jacques Delvaux ("Delvaux"), a public notary, to administer Unipatent while Glock Sr. and Ewert contested its ownership.

110.     Delvaux hired PriceWaterhouseCoopers (PwC) to apply agreed-upon procedures relating to an investigation of transactions in Unipatent to assist Delvaux in determining whether there had been any misappropriation of Unipatent's assets.

111.     Delvaux also had the power to recommend to the Luxembourg court which of Glock Sr. or Ewert owned Unipatent. As such PwC was tasked with gathering information from representatives of both Glock Sr. and Ewert, with the Harper team of investigators facilitating this effort on behalf of Glock Sr. and Glock Sr.'s claim regarding Unipatent.

112.    Harper assigned two members of his team, Michael Stresser and Paul Phelan, ("Phelan") to provide to PwC the information gained through Harper's investigation. Glock Sr. knew of and approved this strategy.

113.    Harper communicated directly with Glock Sr. regarding the investigation and his progress including his communications with PwC. Periodically Harper initiated discussions with Glock Sr. and his designated advisors about the investigation.

114.    Harper also communicated with Glock Sr. regarding the costs of the investigation. After one meeting, Harper raised the issue of the growing demands of the investigation and the resulting increases in his monthly bills and expenses. Glock Sr. cut Harper off with a wave of his hand, saying in words or substance: "You're doing good work. It costs what it costs."

**E.    Harper Discovers the Adaptation of Ewert's Glock Structure Schemes by Glock Sr.**

115.    As the investigation proceeded, Harper learned that the Glock Structure had operated the face value tax fraud and embezzlement schemes set out above.  Consequently, as early as November 1, 2000, Harper warned Glock Sr. in writing of the potential disaster if these issues were not addressed, remedied, and cleared with the appropriate legal authorities.

- 29 -

116.     Unknown to Harper, although Glock Sr. outwardly indicated his agreement with Harper's admonitions and concerns, behind the scenes Glock Sr. was planning to cement his control over, and then perpetuate, Ewert's face value scheme for the Glock Structure instead of cleaning it up.

117.     After Ewert's assassination attempt, Glock HK and Minami quietly were "cloned" at Glock Sr.'s direction. To do this, Glock Sr. directed his Austrian lawyer, Johann Quendler, ("Quendler") to form new companies with the same names as, but in different jurisdictions from, the pre-existing companies and directed the Glock Ges.m.b.H. production "quota" to the new Glock HK. Glock, Sr. then had the cloned Glock HK re-direct funds to the new Minami.

118.     As the Harper team's investigation progressed, Harper determined that he needed to review the records of Glock HK and Minami. Harper requested access to these records. At the time, Harper thought there was only one Glock HK and one Minami; he had not learned of the cloned ones.

119.     Quendler advised Glock Sr. to deny Harper access to the records.

120.     Glock Sr. overruled Quendler and approved Harper's request.

121.     Harper directed one of his team associates to fly to Hong Kong and return with the records.

- 30 -

122.     Upon reviewing the records from Hong Kong, it was evident to Harper that the company had been cloned. He also discovered that Glock Sr., with Quendler's help, had adapted and continued the face value schemes previously thought to be perpetrated solely by Ewert. Specifically, Harper discovered that Glock Sr. had personally signed phony invoices for the cloned Minami in 1999, 2000, and 2001.

123.     In August of 2002, Harper held a face-to-face meeting with Glock Sr. and his Austrian lawyer, Quendler. Harper showed them the records and explained to them that the clone-and-adapt activity was an unlawful scheme.

124.     At first, Quendler pretended he did not understand and/or tried to deflect Harper's questions. Quendler turned to Glock Sr., speaking German so the Americans could not understand.

125.     Glock Sr. grinned, then instructed Quendler to acknowledge to Harper what they had done, saying words to the effect that "you might as well tell them…they are going to find out anyway."

126.     Immediately, Quendler dropped his pretense. In English, he admitted that Glock Sr. and he had set up the cloned companies and had prepared the phony invoices and supporting bank transfers.

- 31 -

127.     Harper advised Glock Sr. of the legal problems and potential liabilities regarding this adaptation and continuance of Ewert's scheme. Harper also advised Glock Sr. that his conduct left him open to serious legal repercussions. Glock Sr. said he would follow Harper's advice to continue cooperating with both Harper's investigation and with the strategy of disclosing fully with law enforcement in order to "clean house." Glock Sr. told Harper, "Let the chips fall where they will."

**F.     Plaintiff Finds the Missing Link To Defeat Ewert's Embezzlement Scheme**

128.     Ewert maintained influence over key companies in the Glock Structure, including Taziria. This control by Ewert was felt by Glock Sr. and others to be a threat to maintaining control over the cash-flow from Glock Inc. and its related entities.

129.     Ewert filed a lawsuit in Curaçao to maintain control of Taziria.

130.     In 2002 Harper assigned Plaintiff with responsibility for developing a strategy to defeat Ewert's claim to Tazaria and, subsequently, directed Plaintiff to present the strategy in person to Glock Sr. in a meeting at Glock Inc.'s Smyrna facility.

131.    After the meeting Harper asked Glock Sr. to authorize him to proceed with Plaintiff's strategy. Glock Sr. authorized Harper and Plaintiff to proceed.

132.    Ewert claimed that Unipatent owned Taziria. Therefore Delvaux's appointment as administrator gave him an interest in the lawsuit. Delvaux agreed to a joint endeavor involving the strategy.

133.    Plaintiff presented the strategy to local counsel and oversaw its implementation.

134.    The strategy worked. Months later, a Curaçao court entered an order that gave Glock Sr. and Unipatent the sought-after rights to Taziria, which rights were subject to adjudication of Glock Sr. and Unipatent's competing claim as the sole owner.

135.    Plaintiff assisted Glock Sr. and Delvaux with the appointment of a new trustee. This trustee helped Plaintiff obtain Taziria's bank records. Plaintiff forwarded these records to Phelan, who used them to trace Taziria funds into numerous Ewert-controlled companies, including an equity contribution in Europtima S.A ("Europtima").

136.    Europtima was key to unraveling the Ewert-led embezzlement scheme. Ewert claimed ownership of Europtima. He claimed Europtima was an

owner of Unipatent. The bank records showed that Taziria had made equity contributions to Europtima. Therefore, whoever owned Taziria also was an owner of Europtima. The Curaçao court had awarded Taziria to Glock Sr. and Unipatent. Therefore, either Glock Sr. or Unipatent was an owner.

137.    Glock Sr. and Delvaux now had the ability to chase Ewert's embezzlement scheme into Ewert's own backyard. The bank records showed equity contributions and other payments to several other Ewert companies and persons of interest. Due to the successful execution of this strategy, the Harper team's work had begun to untangle Ewert's web of sham, shell companies.

## G.    Panama Operation

138.    Reofin occupied a special place in the Glock Structure. Tens of millions of dollars flowed into Reofin's bank accounts through the phony marketing and "support" companies – Taziria, Minami, and BTE.

139.    Harper learned that Ewert had exercised control over Reofin and had used this control to launder tax fraud proceeds.

140.    Glock Sr. claimed he owned Reofin. His claim of ownership was essential to his claim of ownership to Unipatent. This was because Glock Sr. claimed Reofin owned Unipatent.

141.     Harper determined that Ewert's potential ability to control Reofin, if left unchecked, could undermine the work on Glock Sr.'s behalf with PwC to prove Glock Sr.'s ownership of Unipatent. Harper advised Glock Sr. of the threat. Glock Sr. authorized Harper to develop and execute a strategy in Panama.

142.     Harper developed a strategy to seek the assistance of the Panama Attorney General as well as to create corporate documentation of Glock Sr.'s ownership of Reofin.

143.     Harper hired two local Panamanians to assist with this strategy. Joselin Avendano,("Avendano") a Panama lawyer, joined Harper's team. A private investigator, Sixto Saavendra, also joined.

144.     Harper learned that the Panama Attorney General would require Glock Sr. to appear in person and swear to the fact of his ownership of Reofin.

145.     Harper determined that this requirement would pose a dilemma for Glock Sr, in part because of apparently false or misleading testimony Glock Sr. had previously given under oath.

146.     Specifically, on September 18, 1995, Glock Sr. had testified under oath that he did not know who owned Unipatent. This was not the only time Glock Sr. had falsely testified on the now-crucial issue of Unipatent's true ownership.

147.     On March 2, 1998, Glock Sr. had also testified falsely at another deposition for a case then pending in a court in South Carolina. Glock Sr. again falsely testified that he did not own Unipatent.

148.     Glock Sr.'s earlier false testimony appeared designed to conceal from discovery the role of Reofin in the Glock Structure unlawful scheme.

149.     However, the competing claims to Unipatent now forced Glock Sr. to choose between losing control over the Glock Structure or testifying to the truth about Unipatent's ownership by Reofin, even at the risk of the perjury being exposed.

150.     During a face-to-face meeting, Harper advised Glock Sr. his truthful testimony in Panama would conflict with his earlier testimony. Harper also explained to Glock Sr. that he risked losing his claim to Unipatent and its interests in the Glock Structure and the other companies if he did not truthfully testify that he owned Reofin.

151.     In February of 2003, Glock Sr. traveled to Panama and gave sworn testimony to the Panama Attorney General that he owned Reofin. Based on this testimony and Harper's investigative work (and that of his team), the Panama Attorney General decided to indict Ewert.

152.     Harper arranged for payment of the entire cost of the Panama trip out of collections from his prior billings. These costs were part of the bills Harper submitted for payment after he quit the investigation in March of 2003. Harper was never paid for them.

153.     Glock Sr. later testified he owned Unipatent in direct contradiction of his testimony in the 1995 and 1998 depositions. For example in June 2004, Glock Sr. signed a sworn statement that Ewert sold him 100 percent of Reofin in 1987 and, further, that Reofin acquired the Luxembourgish company, Unipatent, a company Glock Sr. also claimed to own.

154.     In 2002, Harper's work led to the re-incarceration of Ewert pending trial in Luxembourg on pre-existing criminal charges arising out of Ewert's attempted assassination of Glock Sr.

155.     Harper's strategy—ratified by Glock Sr. and the Glock Structure—of cooperating and aiding government authorities who were also investigating Ewert led to a sealed indictment on or about November 5, 2002 against Ewert for financial crimes in the United States District Court for the Northern District of Georgia.

156.     The work of Harper's team also facilitated a Panamanian indictment of Ewert on or about February of 2003.

157.    Harper's investigation also resulted in the identification of approximately $103,260,000 of proceeds involved in Ewert's schemes and the tracing of approximately $32,765,000 of these proceeds for their anticipated recovery by Glock Sr. and / or the Glock Structure.

158.    Glock Sr. praised Harper and his team for these results and specifically instructed those approving the periodic payments for Harper's investigation to do nothing to impede the work Harper and his team were doing to aid in implicating Ewert in the schemes involving the Glock entites.

159.    Unbeknownst to Harper, however, Glock Sr. himself had been misleading with regard to his intentions.  Glock Sr.'s expressions of support for Harper's strategy of cooperating with law enforcement authorities were about to evaporate.

## VI.    GLOCK SR.'S REVERSAL OF POSITION

160.    In early March 2003, Glock Sr. suddenly reversed his position, directing one of his lawyers, Quendler, to write Harper with the instruction that all future work must be submitted to Glock Sr., effectively revoking Harper's previously-agreed authority to communicate and cooperate openly and candidly with various government and court-appointed authorities.

- 38 -

161.     On or about March 13, 2003, Ewert was convicted by a court in Luxembourg for his role in the assault upon Glock Sr.   Ewert's conviction cemented Glock Sr.'s complete reversal of Glock Sr.'s intentions regarding Harper's investigation.

162.     Once Ewert was convicted in March of 2003, Harper noticed a complete reversal of Glock Sr.'s attitude towards Harper's investigation and the plan to cooperate with law enforcement authorities in the United States and abroad in cleaning up the compliance issues plaguing the corporate structure of Glock Inc. and its related corporate entities.

163.     Rather than cease the schemes put in place by Ewert, Glock Sr. had adapted and continued them following Ewert's betrayal. Now, rather than "come clean," Glock Sr. appeared poised to conceal and even perpetuate the embezzlement and tax fraud schemes formerly run by Ewert.

164.     Harper realized Glock Sr. did not intend to bring the Glock Structure into legal compliance.

165.     Harper notified Quendler and Glock Sr. of his intent to cease actively pursuing the investigation in late March 2003.

### A.   Harper's Unpaid Bills

166.    When Harper stopped working on the investigation, he was owed a substantial sum for services rendered but not yet paid.

167.    Glock Sr. demanded that Harper submit to an audit of his bills by Glock Sr.'s Austrian accountants. Harper agreed.

168.    On April 15, 2003 the Austrian auditors issued a report, the "Poschel Report," concluding Harper and his team had cooperated and showing Harper was owed a substantial balance on his bills.

169.    Glock Sr. and the Glock Structure concealed the results of the Poschel Report from Harper.

### B.   Criminal Complaint Made Against Harper

170.    In the wake of his falling out with Paul Jannuzzo, Glock Sr. replaced Jannuzzo with Renzulli as the CEO of Consultinvest.

171.    In October 2003, Glock Sr.'s personal lawyer for many years, Peter Manown ("Manown"), confessed to Renzulli he had been stealing from Glock Sr.  Manown disclosed that his thefts involved accounts he had managed for Glock Sr.

172.    The Enterprise capitalized upon Manown's confession of criminal conduct as a false pretext for a campaign to discredit and ruin not only Jannuzzo but Harper and (later) Plaintiff.

173.    Defendants, Glock Sr., and the Glock Structure retained Deichert, an Atlanta lawyer, and assigned him the task of instituting criminal prosecutions against not only Manown but Paul Jannuzzo and Harper.

174.    Glock Sr. and Defendants knowingly and deliberately conspired with the above-named State Actors, acting under color of state law, to tamper with evidence, influence witnesses, and cause a wrongful apprehension / arrest / malicious prosecution, all in furtherance of the goals of the Enterprise.

175.    In June of 2006 Glock Sr., and Defendants Glock Inc., Consultinvest, Renzulli and Deichert filed a criminal complaint with the FBI against Manown and Jannuzzo.

176.    Manown's case was assigned to the U.S. Attorney for the Middle District of Georgia. Manown accepted a plea bargain and a prison sentence of twenty two months.

177.    Glock Sr., Defendants, and the Glock Structure directed Renzulli and Deichert to file a criminal complaint against Manown, Jannuzzo, and Harper

with the City of Smyrna, Georgia. In June of 2007 Renzulli and Deichert filed the complaint.

178.     On or about July 23, 2007, Deichert, acting in his capacity as agent and attorney for Defendants and Glock Sr., delivered a letter to Smyrna intended to support such a criminal prosecution that, among other things, falsely stated:

(a)     that Harper's investigation of the Glock Structure was limited to activities in the United States when, in reality, its scope spanned world-wide;

(b)     that Harper billed for work never performed and overbilling for work performed;

(c)     that Harper wrote a "false exculpatory e-mail" to Avendano regarding Harper's unpaid bills for the Panama Operation;

(d)     that Harper was dismissed by the Glock Structure,     instead of quitting his investigation;

(e)     that Harper had uncovered criminal activity by Manown and Jannuzzo and entered a conspiracy with them whereby Manown and Januzzo would pay Harper in exchange for covering up their crimes when Harper had not and, instead, had uncovered criminal

activity implicating Glock Sr., a fact omitted from Deichert's letter and

(f)     that the Glock Structure had discovered these "findings" of alleged misconduct by Harper and this was the reason Glock had "dismissed" Harper.

179.     All of the above statements in Deichert's letter were untrue, misleading, and part of the Enterprise's plan to target and injure Harper.

180.     Deichert sent the above letter at the behest of, and as an agent of, Glock Sr., Defendants, the Enterprise, and the Glock Structure.

## C.     Glock Sr., Glock Inc., Renzulli, Deichert, and Core Fabricate a Malicious Prosecution of Both Harper and Plaintiff

181.     The Enterprise's complaint was assigned to Officer Harrison of the Smyrna Police Department.

182.     In late 2007 or early 2008, Glock Sr., Glock Inc., and/or Consultinvest hired Core, another attorney, to manage, supervise, and control Harrison in the pursuit of the false arrest and prosecution of Harper and Plaintiff.

183.     Glock, Sr. and the Enterprise became dissatisfied with the progress in the federal criminal case in part because, upon information and belief, the FBI refused to share with them the content of its interview of Manown.

184.     Sometime in 2006 or 2007, Glock Sr., Glock Inc., Consultinvest, Renzulli, and Deichert recruited the Cobb County District Attorney to get the Manown case transferred from the U.S. Attorney. In a highly unusual move, Cobb County D.A. Patrick Head ("D.A. Head") obtained a transfer of the case. After the transfer of his case, Manown negotiated a plea bargain with D.A. Head. Instead of the federal sentence of twenty two months, Manown's plea deal was sweetened to mere probation.

185.     The Cobb County D.A. scheduled a proffer of Manown on October 17, 2007. In another highly unusual move, the Cobb County D.A. permitted Renzulli, identified as a witness in the Smyrna Complaint, to control the proffer and questioning of Manown.

186.     At the proffer, Renzulli repeatedly tried to maneuver Manown into implicating Harper. But Manown denied that Harper had stolen anything or had engaged in any criminal acts.

187.     Instead of implicating Harper, Manown's testimony implicated Glock Sr. as "a bad guy" who "bribes people." This angered Renzulli.

188.     Upon information and belief, none of the State Actors present at the Manown proffer ever investigated Manown's testimony of Glock Sr.'s criminality.

## D.    Harper's Investigative Files

189.    On August 30, 2007, Smyrna and Harrison obtained three boxes of records of Harper's investigation from a former member of Harper's team as well as a black ring binder labeled "Glock worldwide distributor list", a black ring labeled binder "Examination mission based on agreed upon procedures" and dated 11/8/2000, and a maroon notebook regarding Ewert activities. These binders held information relating to the tax-fraud schemes and also showed work performed by Harper and his team as set out in his bills.

190.    Smyrna has been unable to return these boxes, records, binders, and notebook.  Upon information and belief, these documents have been tampered, altered with, and / or destroyed by the Enterprise.

## VII.   THE ENTERPRISE CONSPIRES WITH, DIRECTS, AND CONTROLS STATE ACTORS

191.    Through his proxies, Glock Sr. controlled the flow of information from himself and the Glock Structure to Harrison and Butters. Specifically, Deichert, Rennzulli and Core directed and controlled the criminal prosecution of Harper and Plaintiff.

192.    The State Actors—Butters and Harrison—entered into a conspiracy with the Enterprise, and became part of the Enterprise for purposes of facilitating an extensive and comprehensive campaign of evidence tampering.

- 45 -

193.    The State Actors were aware the Enterprise had destroyed key evidence that would compromise any prosecution of Plaintiff.   When Harrison became interested in a Glock Inc. wire transfer record from 1997, he was informed by Core as follows: "The records at Glock Inc. were shredded up until 2002 so we don't have Glock Inc. records sending that wire."

194.    Harper's investigation for Glock Sr. continued from 2000 until March 26, 2003. Defendants falsely claimed that Harper's overbilling and billing for services not rendered began in 2000 and that this activity was discovered in May 2003. Evidence exposing these claims as false would have existed in the Glock Inc. records from 2000 through 2002 that were shredded and destroyed.

195.    Those records may also have included Harper's November 1, 2000 Risk Analysis and letter to Glock Sr. and Glock Inc. These records describe in detail Harper's early discoveries in the investigation and instructions to Glock Sr. including, without limitation, Harper's statement that "[b]ased on the evidence we now have, we must proceed with another mission as well, to protect you [Glock Sr.] and your company from the inevitable counter offensive by Ewert and the possible inquiry by foreign and U.S. officials" and also that "the U.S. government will adopt our explanation of the evidence and stick with it *if we continue to be open and honest*." (Emphasis added.)

- 46 -

196.     Glock Inc. generated the majority of the revenues of the Glock Structure in the 1999-2001 time period. A portion of these revenues was transferred through the face value tax-fraud schemes as adapted and continued by Glock Sr. and the Glock Structure during this timeframe. False and fraudulent invoices and other records going to and coming from Glock Inc. would have existed as part of these schemes.

197.     Glock Sr. and the Enterprise withheld from Harrison and Butters the extensive records of Harper's investigation that would have: (a) described the terms of Harper's engagement with Glock Sr. and the Glock Structure; (b) supported a defense of the Plaintiff to any criminal prosecution for "overbilling"; (c) implicated Glock Sr. and the Glock Structure in various crimes; and / or (d) supported the work descriptions, time entries, and expenses set out in Harper's bills.

198.     Documents withheld (or destroyed) by the Enterprise from the State Actors with the intent of causing injury to the Plaintiff include, without limitation:

(a)     Harper's Risk Analysis, dated November 1, 2000;

(b)     Harper's letter to Glock Sr. sent c/o Jannuzzo and dated November 1, 2000;

(c)     records proving up the Glock Structure scheme involving
        Consultinvest's purchase of the land and building comprising the
        Glock Structure's North American headquarters in Smyrna;

(d)     records proving up Glock Sr.'s complicity in the clone-and-adapt
        activities to continue the Glock Structure schemes even after
        Ewert's assassination attempt;

(e)     the ninety five page PwC First Report, dated October 25, 2002,
        raising numerous questions about the commercial relationships
        within the Glock Structure, including the fact that "significant
        payments were made to external companies whereas there is no
        clear evidence of services having been rendered by these
        counterparts;"

(f)     the twenty page PwC Second Report (draft) detailing the face
        value tax-fraud schemes, the tracing of proceeds involved in the
        same, the fact PwC's review of marketing costs was based upon
        information provided by "GG's lawyers," i.e. were the work of
        Harper and his team, and concluding "the provision of Invoicing
        Companies [Base Technical, Glock HK, and Glock America in

the Glock Structure] had no economic substance but were only driven by tax reasons;" and

(g)      numerous e-mails prepared by Plaintiff and copied to Glock Sr.'s attorney in Luxembourg at Glock Sr.'s specific request regarding the activities to defeat Ewert's embezzlement scheme in Curaçao and the subsequent uses of this important information.

199.      In addition to concealing the above information and documents, the Enterprise, especially Core, prepared numerous false accountings of Harper's bills by selectively removing certain bills and time periods of bills from the accountings to make it appear that payments exceeded billings on specific dates and during specific time periods.

## VIII.  INDICTMENT, FALSE ARREST AND RESOLUTION IN FAVOR OF PLAINTIFF

200.      From May 2009 through January 2010 Renzulli and Core drafted the Indictment for use by Butters and Officer Harrison.

201.      Core, Officer Harrison, and Butters prepared a misleading "chart" for Officer Harrison to use with his grand jury testimony in order to obtain an indictment of Plaintiff. Officer Harrison used this chart as an aid to his false testimony before the grand jury.

- 49 -

202.    On January 22, 2010, armed officers acting in concert with the Enterprise arrested Plaintiff at his home and in front of his wife and young children. Armed officers also arrested Harper.

203.    Plaintiff was named as a co-defendant in three of the ten false and fabricated Counts and a conspiracy Count.

204.    All of the charges against Plaintiff were fabricated based on the falsified evidence, influenced witnesses, evidence either destroyed or withheld  by the Glock Structure and Enterprise, and misleading statements of Glock, Sr. and Defendants along with those of Harrison and Butters, including, without limitation:

(a)    falsified records of the terms of Harper's engagement with Glock Sr. and the Glock Structure;

(b)    selective review of Harper's bills and payments against these bills; and

(c)    double-counting funds paid against Harper's bills as Glock Structure money.

205.    In November 2012, the voters of Cobb County, Georgia elected a new District Attorney.

206.    On March 14, 2013, the new Cobb County D.A. dropped all charges against Harper and Plaintiff.

## IX.   PLAINTIFF'S EVIDENCE OF ENTERPRISE CONSPIRACY WITH STATE ACTORS BUTTERS AND OFFICER HARRISON FOR PURPOSES OF EVIDENCE- AND WITNESS-TAMPERING

207.   In conspiracy with the Enterprise, Butters and Officer Harrison concealed and withheld dozens of e-mails, attachments, and records from Harper and Plaintiff while they were under indictment including, without limitation:

(a)   a copy of an exculpatory e-mail from Harper to a Panamanian lawyer who assisted on the Panama Operation in which Harper, in 2003, instructed the Panamanian lawyer to "share everything with Glock if they ask";

(b)   records showing the transfer to Glock Sr., Defendants, the Glock Structure, and the Enterprise from the evidence room of the Smyrna  Police Department of three boxes of records of Harper's investigation  as well as a black ring binder labeled "Glock worldwide  distributor  list",  a  black  ring  binder  labeled "Examination  mission  based  on  agreed  upon  procedures"  and dated 11/8/2000 and a maroon notebook regarding Ewert activities, all of which were material documents that have not been accounted for since and, upon information and belief, were destroyed by the

Enterprise for the purposes of prejudicing Plaintiff's defense and/or protecting the Glock Structure;

(c)     dozens of communications between Core, Harrison and Butters showing the following:

       (i)     Core's instructions to Harrison and Butters to obtain and transfer to Core and the Enterprise records obtainable only under color of state law;

       (ii)    Officer Harrison and Butters' compliance with these instructions; and

       (iii)   Core's unsupervised access to, and control over, these records. Upon information and belief, some of these records have not been accounted for since and, upon information and belief, were destroyed by the Enterprise with the intent of prejudicing Plaintiff's defense;

(d)     a June 9, 2008 e-mail in which Core suggested to Butters and Harrison the charges against Plaintiff were weak ("I don't think we will wind up wanting to charge [Plaintiff]"), approximately eighteen (18) months before the Enterprise obtained the indictment of Plaintiff;

- 52 -

(e)     Core's e-mail dated March 21, 2011 to Butters, Harrison, and the State's supposed expert witness against Plaintiff expressing worry that wire transfer payments for work performed by the Harper team "line[d] up with the bills" and that Core's own accountings suggested the alleged "over billings" were cancelled out by "under billings";

(f)     Core's instructions via e-mail to Butters and Harrison on how to prepare the State's supposed expert witness against Plaintiff in which Core directed Butters and Officer Harrison to instruct the expert against mentioning Core's role in his preparation but, if directly asked, that the witness "should just state that [Core is] Glock counsel and ha[s] been working with you. No more than that." Further, Core instructed Butters and Harrison the expert witness should not divulge "any communications with me, you, or Keith" [Harrison] because such communications were "work product and attorney client privileged";

(g)     e-mail suggesting the extent of the State Actors' complicity in influencing witnesses and tampering with evidence, to wit:

Core's e-mail to Butters demanding Butters obtain and share with

- 53 -

Core the tax returns of a witness and former member of Harper's
investigative team, Paul Phelan, so he could "break" him after
Phelan made statements favorable to Harper and Plaintiff's defense
during an interview with Officer Harrison;

(h)    Officer Harrison and Core's e-mail exchanges on May 15, 2009
regarding Harrison's admission that he left files "at the plant" and
is looking for "Pombert's physical file" and "bank records"
because he "can't find" them (upon information and belief,  the
"plant" is code for Glock's corporate offices in Smyrna);

(i)    an e-mail by Core to Butters, Officer Harrison, and the State's
expert witness that attached a "witness spread sheet" file in which
Core tells them "This will be our trial guide," evincing the control
exercised by Core and the Enterprise over the State Actors and the
malicious prosecution of the Plaintiff;

(j)    Core's e-mail dated September 2, 2010 containing instructions on
how the State Actors should conduct a potential proffer of
Plaintiff;

(k)    an e-mail by Core to Butters and Officer Harrison dated December
10, 2009 stating that Mathis, a witness, "completely understands

the case, to include those acts he did previously did not know

about" and that Core "is no longer concerned, but I would still like

to downplay the 'witness' label. Almost all of his income is now

derived from Glock, therefore he will always come when

directed";

(l) e-mails showing the Enterprise, not Butters or Officer Harrison,

were controlling the production of documents in the criminal

prosecution of Harper and Plaintiff, including discussions of

"somehow lost" documents not included in an earlier document

production to Plaintiff;

(m) numerous Core e–mails to Butters and Officer Harrison showing

that Core was selecting the records the Enterprise wanted in the

State's files and that Core was interviewing witnesses the State

Actors never interviewed and instructing witnesses to interview

other witnesses.

(n) e-mail in which Core demanded Officer Harrison circulate to him a

transcription of a witness interview, ending "Gimmee, gimmee…";

(o)     numerous e-mails from Core to Butters and Harrison revealing

Core's many guesses at "facts" and subsequent admissions these

theories were incorrect and/or unsupported by any evidence;

(p)     numerous accountings prepared by Core and delivered to Officer

Harrison and Butters revealing the selective use of Harper's bills

and payments to create false and fictitious "overbillings"; and

(q)     numerous e-mails and attachments during the period May 2009

and January 2010 prepared by Core and sent to Butters and Officer

Harrison discussing drafts of the Indictment against Harper and

Plaintiff and attaching drafts of the Indictment.

208.    The above evidence of ongoing, deliberate, and coordinated
evidence tampering, witness influencing, and malicious prosecution was only
obtained subsequent to the *nolle prosequi* of Harper and Plaintiff through requests
for documents under Georgia's Open Records Act. These documents were not
disclosed by the State Actors or the Enterprise during the actual criminal
prosecution of Harper and Plaintiff notwithstanding a legal (and constitutional)
duty to do so and no *bona fide* claim of "attorney-client privilege" sometimes
bogusly claimed in e-mails amongst the conspirators.

## X.   RESPONDEAT SUPERIOR

209.   At all relevant times, the Enterprise was acting within the scope of its employment for and as the agents of Defendants.

210.   Defendants are liable to Plaintiff, jointly and severally, under the principle of respondeat superior for any damages arising out of the acts undertaken and committed against Plaintiff by agents named as the Enterprise who were under their employ and/or control and where acting in their name and on their behalf.

## COUNT ONE:
## CONSPIRACY FOR VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983

211.   Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-210 as if fully restated hereinafter.

212.   A common understanding existed between the State Actors and the Enterprise, forming an unlawful conspiracy with said State Actors to deprive Plaintiff of his constitutional rights under color of state law.

213.   Beginning in or around June 21, 2007 and continuing through on or about March 15, 2013, in Cobb County, Defendants, Glock Sr., the Glock Structure, and the Enterprise formed a common understanding with the State Actors (Officer Harrison and Butters) to take certain unlawful and improper actions such that the State Actors, under color of state law, would target Plaintiff in order to deprive him of his rights under the United States Constitution.

214.    The Enterprise, together with the State Actors, entered into a conspiracy that, acting in concert, agreed to commit unlawful acts and by unlawful means to inflict injury upon Plaintiff.   The Enterprise committed overt acts resulting in damage to Plaintiff with the purpose of furthering the Enterprise's goals of injuring him.

215.    The object of this conspiracy was to violate the constitutional rights of Plaintiff to be secure in his person, house, papers, and effects, against unreasonable searches and seizures, to violate the right of the people that no Warrants shall issue, but upon probable cause, to violate Plaintiff's right to due process of law under the Fourteenth Amendment, to violate his right to be tried upon evidence that is unmanipulated,  and to violate his right to be tried using witnesses that are uninfluenced by improper means.

216.    The Enterprise controlled, directed, intertwined, and intermingled themselves with State Actors who were clothed with state authority to investigate and prosecute crimes.   This control and intertwined relationship was such that, although the Enterprise was composed of private individuals or entities, the acts of the State Actors were fairly chargeable to the Enterprise as if they were agent and principal.

217.    Officer Harrison and Butters were at all relevant times public officials, state actors, and employees of Smyrna and the Cobb County District Attorney's office, respectively, acting in concert with and under the control of and at the direction of Defendants, Glock Sr., the Glock Structure, and the Enterprise.

218.    Although Defendants, Glock Sr., the Glock Structure, and the Enterprise were ostensibly private actors themselves, they were at all relevant times engaged in state action or in conduct that is fairly attributable to the State (and vice versa) in that: (1) the deprivation of Plaintiff's civil rights depended upon a common understanding and conspiracy with the State Actors and was executed through procedures or authority of the State or by a person for whom the State is responsible such that the above-named Defendants can fairly be said to have deprived Plaintiff of his constitutional rights under color of state law.

219.    Defendants, Glock Sr., and the Enterprise, together with the Glock Structure, caused a criminal prosecution to be instituted and continued against Plaintiff with malice and without probable cause.

220.    The criminal prosecution terminated in favor of Plaintiff.

221.    As a direct and proximate result, Plaintiff suffered damages including, without limitation, personal injury, pain, outrage, public humiliation, shame and anxiety, loss of time from work, and injury to his peace, happiness, and

feelings, damage to his reputation and professional livelihood, lost earning capacity, and attorney fees paid to defend against the underlying criminal prosecution and investigation of this case.

## COUNT TWO:
### State Law Claim For Malicious Arrest And Prosecution

222.    Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-221 as if fully restated hereinafter.

223.    With malice but without probable cause, the Defendants caused a criminal prosecution to be instituted or continued against Plaintiff.

224.    The criminal prosecution terminated in favor of Plaintiff.

225.    As a direct and proximate result, Plaintiff suffered damages including, without limitation, shame, humiliation, anxiety, personal injuries, loss of time from work, diminished earning capacity in his profession, embarrassment, costs of legal defense and investigation expenses, and attorney's fees paid in the investigation and pursuit of this action.

## COUNT THREE:
### O.C.G.A. § 16-14-4(A)

226.    Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-225 as if fully restated hereinafter.

227.     The Enterprise Defendants engaged in an ongoing pattern of racketeering activity as defined by Georgia RICO, O.C.G.A. § 16-14-3(8).

228.     The members of the Enterprise were acting within the scope of their employment for, and as the agents of, Defendants.

229.     The Georgia RICO pattern of racketeering activity engaged in by the Enterprise and Defendants consists of more than two acts of racketeering activity that were ongoing, coordinated, and bent towards a common *modus operandi* and objective.

230.     It was part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would knowingly and willfully falsify documents to conceal or cover up that Harper's bills reflected the rates and terms of his engagement for his investigation, that Harper billed as agreed, that Harper earned all of the fees that he was paid, and that he was owed a substantial sum of money for services rendered when he quit the investigation.

231.     It was further part of the conspiracy that some of the coconspirators, aided and abetted by each other, would make false, fictitious, or fraudulent statements or representations about Harper's services, Harper's bills for these services, and payments received by Harper against his bills for the investigation.

- 61 -

232.     It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors: would (i) communicate with witnesses threats of injury or damage to the person, property, or employment of the witnesses, or would offer or deliver a benefit, reward, or consideration to such witnesses, with intent to deter witnesses from testifying freely, fully, and truthfully before the grand jury and in the criminal proceedings pending against Harper and Plaintiff in the Cobb County Superior Court, and (ii) knowingly use intimidation, physical force, or threats in misleading conduct toward another person with intent to influence, delay, or prevent the testimony of persons before the grand jury and in the criminal proceedings pending against Harper and Plaintiff in the Cobb County Superior Court.

233.     It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would tamper with evidence with the intent:

    (a)  to prevent the apprehension of Glock Sr., members of the Glock Structure and others;

    (b)  to cause the wrongful apprehension of Plaintiff;

    (c)  to obstruct the prosecution of Glock Sr., the Glock Structure and others; and

(d)   to obstruct the defense of Plaintiff by knowingly destroying, altering, concealing, or disguising physical evidence or making, devising, preparing, or planting false evidence.

234.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would plot to discredit, punish, falsely arrest, and falsely imprison Plaintiff.

235.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would:

(a)   review and selectively extract documents from the books and records of Defendants, Glock Sr., and the Glock Structure as well as from the records of Harper and Plaintiff,

(b)   meet with and supply false, misleading and incomplete information to the State Actors;

(c)   withhold or destroy exculpatory evidence in order to prejudice the  defense of Plaintiff;

(d)   commit perjury;

(e)   seize records of Harper's investigation, confidential tax returns, bank statements and other records of Plaintiff and others;

(f)   tamper with witnesses;

- 63 -

(g)      tamper with evidence including, without limitation, knowingly

falsify chain of custody and other official records and court filings,

and knowingly withhold exculpatory evidence; and / or

(h)      falsely swear in affidavits signed in support of warrants for the seizure

of records.

236.      It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would maliciously prosecute Plaintiff in violation of his Fourth Amendment and Fourteenth Amendment rights.

237.      Defendants, Glock Sr., the Glock Structure, and the Enterprise engaged in a pattern of racketeering activity, to wit:

(a)      tampering with evidence with the intent of causing the wrongful

apprehension of the Plaintiff and obstructing the defense of the

Plaintiff, a crime under O.C.G.A. § 16-10-94(a) and predicate act

under Georgia's RICO law, by knowingly destroying, altering,

concealing and/or disguising physical evidence and/or making,

devising, preparing or planting false evidence;

(b)      threatening or causing physical or economic harm to another

person or attempting to cause physical or economic harm to

another person with the intent to hinder, delay, prevent or dissuade any person from:

    (i)   attending or testifying in an official proceeding;

    (ii)   reporting in good faith to law enforcement the commission of an offense under the laws of this state; and/or

    (iii)   causing a criminal prosecution to be sought or instituted or assisting in such prosecution or proceeding, any of which is a crime under O.C.G.A. § 16-10-32(b) and predicate act under Georgia's RICO law;

(c)    using intimidation, physical force, threats, corrupt means or misleading conduct with intent to influence, delay, or prevent the testimony of any person in an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(A) and predicate act under Georgia's RICO law;

(d)    using intimidation, physical force, threats, corrupt means or misleading conduct with intent to cause or induce any person to withhold testimony or a record, document, or other object from an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(B)(i) and predicate act under Georgia's RICO law;

- 65 -

(e)     using intimidation, physical force, threats, corrupt means or misleading conduct with intent to cause or induce any person to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(B)(ii) and predicate act under Georgia's RICO law;

238.    It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money. O.C.G.A. § 16-14-4(a).

239.    Defendants acquired and maintained an interest in, and control over property, including money, through a pattern of racketeering activity.

240.    Plaintiff has been injured by reason of the above-named Defendants' violation of O.C.G.A. § 16-14-4(a) and is entitled to recover three times the actual damages sustained.

241.    The above-named Defendants' violations of Georgia RICO proximately caused injury to Plaintiff.  As a direct result of these violations, Plaintiff has suffered injury, *inter alia*, to his person, property, professional livelihood, reputation, and mental well being.

## COUNT FOUR:
## O.C.G.A. § 16-14-4(B)

242.     Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-241 as if fully restated hereinafter.

243.     It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, an enterprise through a pattern of racketeering activity. O.C.G.A. § 16-14-4(b).

244.     The above-named Defendants were employed by or associated with an enterprise and did conduct or participate in, directly or indirectly, an enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b).

245.     Plaintiff has been injured by reason of the above-named Defendants' violation of O.C.G.A. § 16-14-4(b) and is entitled to recover three times the actual damages sustained.

246.     The above-named Defendants' violations of Georgia RICO proximately caused injury to Plaintiff.  As a direct result of these violations, Plaintiff has suffered injury, *inter alia*, to his person, property, professional livelihood, reputation, and mental well being.

## COUNT FIVE:
## O.C.G.A. § 16-14-4(C)

247.     Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-246 as if fully restated hereinafter.

248.     It is unlawful for any person to conspire or endeavor to violate any of the provisions of Georgia's RICO law, either subsection (a) or (b) of O.C.G.A. § 16-14-4.

249.     The above-named Defendants conspired amongst themselves, the State Actors and perhaps others, known and unknown, to violate subsections (a) and/or (b) of O.C.G.A. § 16-14-4, Georgia's RICO law.

250.     The above-named Defendants committed overt acts in furtherance of the conspiracy.

251.     Plaintiff has been injured by reason of the above-named Defendants' violation of O.C.G.A. § 16-14-4(c) and is entitled to recover three times the actual damages sustained.

252.     The above-named Defendants' violations of Georgia RICO proximately caused injury to Plaintiff.  As a direct result of these violations, Plaintiff has suffered injury, *inter alia*, to his person, property, professional livelihood, reputation, and mental well being.

## COUNT SIX:
## PUNITIVE DAMAGES

253.     Plaintiff realleges and incorporates by reference herein the allegations set forth in paragraphs 1-252 as if fully restated hereinafter.

254.     Plaintiff is entitled to punitive damages to penalize, punish, or deter Defendants.

255.     The above-described actions showed willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants.

256.     Said actions of Defendants were calculated with the specific intent to cause harm to Plaintiff such that, under O.C.G.A. § 51-12-5.1(f), there is no cap on the amount of punitive damages that may be awarded.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff asks for a Judgment and other relief as follows:

(a)     Judgment in an amount equal to three times the actual damages sustained and punitive damages, pursuant to O.C.G.A. § 16-14-6(c);

(b)     That the Judgment against these Defendants be joint and several;

- 69 -

(c)     Attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred, pursuant to the laws of Georgia and federal law, including but not limited to, O.C.G.A. § 16-14-6(c) and 42 U.S.C. § 1988;

(d)     Pre-judgment and post-judgment interest as provided by law;

(e)     Plaintiff is an "aggrieved person" within the meaning of O.C.G.A. §16-14-6(b). As a result, Plaintiff may be entitled to appropriate preliminary and permanent injunctive relief;

(f)     Pursuant to O.C.G.A. § 16-14-6(a), Plaintiff asks the Court to issue appropriate orders and judgment requiring the above-named Defendants to cease their illegal conduct and imposing reasonable restrictions upon their future activities sufficient to prohibit future violations of the law;

(g)     Judgment ordering the dissolution or reorganization of Glock Inc. and/or Consultinvest, pursuant to O.C.G.A. § 16-14-6(a)(3);

(h)     Judgment ordering the suspension or revocation of any license, permit, or prior approval granted by any agency of   the   state, pursuant to O.C.G.A. § 16-14-6(a)(4);

(i)     Judgment ordering the forfeiture of the charter of Glock Inc. and/or

        Consultinvest, corporations organized under the laws of Georgia,

        pursuant to O.C.G.A. § 16-14-6(a)(5);

(j)     Trial by jury; and

(k)     Such other relief as the Court deems just and proper.

Respectfully submitted, this 11th day of March, 2015.

                        **THE BARNES LAW GROUP, LLC**

                        */s/John F. Salter*
                        **JOHN F. SALTER**
                        Ga. Bar No. 623325
                        **ROY E. BARNES**
                        Ga. Bar No. 039000

**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Ga.  30060
BARNESLAW 770-227-6375
BARNESFAX  770-227-6373
www.barneslawgroup.com
john@barneslawgroup.com
roy@barneslawgroup.com